# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

V.

**ANTONIO "TONY" CHAKONAS,**
(d.o.b. September 9, 1966) and
**GARRETT GHARIBEH**
(d.o.b. June 4, 1986)

CRIMINAL COMPLAINT

CASE NUMBER: 11-m-403

I, Brian Due, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. During the period from approximately November 2010, through March 4, 2011, in the State and Eastern District of Wisconsin, the State and Northern District of Illinois, and elsewhere, **ANTONIO "TONY" CHAKONAS** and **GARRETT GHARIBEH**, did transport and transfer in interstate commerce property having a value of $5,000 or more, knowing that said property had been stolen and taken by fraud, all in violation of Title 18, United States Code, Section 2314.

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

Please see the attached affidavit of Special Agent Brian Due.

Continued on the attached sheet and made a part hereof: _X_ Yes ___ No

_____
Signature of Complainant
BRIAN DUE

Sworn to before me and subscribed in my presence,

March 4, 2011
Date

at Milwaukee, Wisconsin
City and State

The Honorable William E. Callahan, Jr.
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

I, Brian K. Due, being duly sworn on oath, state as follows:

## I. Background, Training, & Experience

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") of the United States Department of Justice, and I have been so employed for 23 years. I am currently assigned to the Milwaukee Division's White Collar Crime squad. As part of my duties, I investigate violations of federal criminal laws, particularly those laws in Title 18 of the United States Criminal Code.

2. During my 23 years as an FBI Special Agent, I have participated in: (a) numerous wire fraud, mail fraud, and bank fraud investigations, warrants, and seizures; (b) the execution of numerous search warrants for documents, records, and proceeds from illegal activities; (c) the subsequent investigations and analysis of evidence seized pursuant to those warrants; and, (d) the interviewing of defendants, witnesses, informants, and other persons who may have had personal knowledge of the distribution and concealment of proceeds derived or gained from illegal activities.

3. This affidavit is submitted in support of my application for a criminal complaint charging Antonio "Tony" Chakonas and Garrett Gharibeh with transporting property, which has a value of $5,000 or more, in interstate commerce knowing that the property has been stolen or taken by fraud, in violation of Title 18, United States Code, Section 2314, and for the issuance of warrants for the arrest of Chakonas and Gharibeh.

4. Since this affidavit is submitted only for the limited purpose of securing a criminal complaint and arrest warrants, I have not set forth each and every fact known to me concerning this investigation. I have included what I believe are facts sufficient to establish probable cause for the complaint and arrest warrants sought. I have also included any material which I believe is exculpatory and of which I have knowledge. All of the information contained herein is based upon

1

my personal knowledge and investigation, or upon information supplied to me by other law enforcement officers or citizen witnesses, all of whom I believe to be truthful and reliable. Everything set forth herein is true and correct to the best of my knowledge and belief.

## II. Background of Investigation

5. I was previously assigned to investigation and prosecution of Sujata Sachdeva. On January 10, 2010, Sachdeva was charged in a six-count indictment returned in this district with using interstate wire communications to carry out a scheme to defraud her former employer, Koss Corporation, in violation of 18 U.S.C. § 1343 ("wire fraud"). Specifically, the indictment alleged that, during the period from at least January 2004 through December 2009, Sachdeva used her position at Koss to embezzle more than $31 million, which she used to purchase personal items, including women's clothing, furs, purses, shoes, jewelry, automobiles, china, statues and other household furnishings.

6. The indictment included a forfeiture provision that sought the forfeiture of any property, real or personal that constituted or was derived from proceeds traceable to Sachdeva's fraud.

7. On January 29, 2010, Sachdeva entered into an agreement with the government entitled First Agreement Not to Impair or Dissipate Assets and to Cooperate in the Seizure of Assets That Might Be Subject to Forfeiture. Pursuant to this agreement, Sachdeva agreed not to sell, transfer, give away, borrow against, or remove with intent to conceal, any personal property that might reasonably have a resale value of $100 or more, without both conferring with the United States Attorney's Office and obtaining the district court's approval to do so. Sachdeva also agreed to

2

disclose to agents of the Federal Bureau of Investigation ("FBI") the location of any places, besides her residence, where she was currently storing any personal property.

8. This agreement was filed with the district court and expressly made part of the conditions of Sachdeva's pretrial release.

9. On July 17, 2010, the government filed a plea agreement that had been reached with Sachdeva. Under the terms of her plea agreement, Sachdeva agreed to plead guilty to the six wire fraud charges set forth in the indictment. Sachdeva also agreed to the entry of a money judgement of forfeiture against her equal to the amount of proceeds she obtained as a result of her offense, which the government estimated to be $34 million.

10. As part of this plea agreement, Sachdeva acknowledged that the money judgment anticipated to be entered against her would substantially exceed her net worth. As a result, Sachdeva expressly agreed that, any and all property in which she had any interest was subject to forfeiture to the United States either directly as property constituting or traceable to proceeds of her wire fraud scheme, or indirectly as substitute assets.

11. Pursuant to a second non-dissipation agreement, Sachdeva also agreed to provide the United States with a list of all of her assets having a value greater than $1,000. On November 17, 2010, Sachdeva executed and provided to the government a Financial Disclosure Affidavit purporting to disclose to the government any real or personal property having a value of $1,000 or more, in which she had an ownership interest, other than what had already been disclosed to the government. In her affidavit, Sachdeva did not disclose an ownership interest in any jewelry.

3

12. On that same day, November 17, 2010, the Honorable Lynn Adelman, U.S. District Judge, sentenced Sachdeva to imprisonment for a period of 132 months (11 years) and ordered her to make restitution to Koss in the amount of $34 million.

13. Judge Adelman allowed Sachdeva to remain free on bond until she was required to surrender to the Bureau of Prisons to begin serving this sentence. On or about February 1, 2011, Sachdeva surrendered to the BOP to begin serving her sentence.

14. As detailed below, my investigation has revealed that Chakonas and Gharibeh are attempting to sell a number of items of jewelry that Sachdeva purchased using funds embezzled from Koss. These items are, therefore, subject to forfeiture to the United States as property derived from proceeds traceable to Sachdeva's fraud.

15. Moreover, Sachdeva failed to disclose her ownership of these pieces of jewelry either to the FBI, as required by the First Agreement Not to Impair or Dissipate Assets, or in her Financial Disclosure Affidavit that she executed on November 17, 2011, and provided to the government.

### III. Basis for Facts Establishing Probable Cause

16. On February 22, 2011, I interviewed C.S., who is the owner of a jewelry store located in the Milwaukee area. C.S. employed Chakonas for approximately four years until C.S. fired him on January 31, 2011.

17. According to records obtained in connection with the investigation of Sachdeva's embezzlement from Koss, during the period from July 2006 through December 2009, Sachdeva used Koss funds to pay for more than $460,000 in purchases from C.S.'s jewelry store. C.S. stated that at the time Sachdeva was indicted in January 2010, C.S. had in her possession 11 items of jewelry that Sachdeva had purchased during the period from November 2007 through December 2009.

4

According to records provided by C.S., Sachdeva paid a total of $237,070 for these items. I have determined that all 11 pieces of jewelry were purchased by Sachdeva using funds stolen from Koss.

18. At no time did Sachdeva disclose to the FBI or the United States Attorney's Office the existence of, or her ownership interest in, the 11 items of jewelry held by C.S.

19. According to C.S., in late 2010, Chakonas approached C.S. and indicated that Sachdeva had instructed Chakonas to take the pieces of jewelry C.S. was holding for Sachdeva to Sachdeva's lawyer, Michael Hart. According to Chakonas, Hart had indicated he wanted to hold onto the items. On or about October 26, 2010, C.S. gave the 11 pieces of jewelry to Chakonas, along with $800 in cash, with the understanding that Chakonas would deliver the jewelry items to Hart, and the cash to Sachdeva.

20. On March 1, 2011, I spoke to Attorney Hart, who indicated he was unaware of jewelry being held by C.S. for Sachdeva; had never instructed Chakonas to retrieve any such jewelry; and has never received any jewelry from Chakonas or C.S.

21. C.S. provide me with descriptions of and photographs of the 11 items of jewelry in question.

22. C.S. further indicated that, on January 28, 2011, she had spoken to Sachdeva about the jewelry items. Sachdeva told C.S. that Chakonas never gave the jewelry items to Hart, and stated she believed Chakonas still had the items. Sachdeva also told C.S. that Chakonas never delivered the $800 in cash. According to Sachdeva, Chakonas and his associate kept the cash for "gas money," purportedly in exchange for errands that they had conducted on Sachdeva's behalf.

23. On February 24, 2011, I interviewed S.H., who is the owner of a jewelry store located in the Milwaukee area. According to records obtained in connection with the investigation of

Sachdeva's embezzlement from Koss, during the period from April 2007 through October 2008, Sachdeva used Koss funds to pay for more than $226,000 in purchases from S.H.'s jewelry store.

24. S.H. stated that, at the time Sachdeva was indicted in January 2011, S.H. was still in possession of approximately 29 pieces of jewelry Sachdeva had previously purchased but had asked S.H. to hold for her. According to records provided by S.H., these items had a total purchase price of $148,879.45.

25. At no time did Sachdeva disclose to the FBI or the United States Attorney's Office the existence of, or her ownership interest in, the items of jewelry held by S.H.

26. According to S.H., in the Fall of 2010, Chakonas approached S.H. and indicated Sachdeva wanted Chakonas to pick up the jewelry S.H. was holding for her. Chakonas told S.H. that Sachdeva had convinced the government that she had purchased the items from S.H., using her own funds and that was why S.H.'s jewelry store had not been named in the newspaper stories discussing Sachdeva's case.

27. Chakonas told S.H. that the jewelry items S.H. was holding would be put in a safe-deposit box, and that they would be held there for the benefit of Sachdeva's children. S.H. already knew by this point in time that Chakonas and Sachdeva were friends. S.H. requested a letter from Sachdeva before he would turn the items over to Chakonas.

28. Chakonas subsequently provided a handwritten note to S.H. which was written on the stationery of C.S.'s jewelry store, where Chakonas was employed. S.H. provided a copy of the note to me. The handwritten note, which was undated, states as follows: "Dear [S.H.], I wish to thank you for graciously storing pieces of my personal jewelry. At this time, I would like you to turn the items over to Tony Chakonas. Respectfully, Sujata Sachdeva."

29. Based on this note, in November 2010, S.H. turned over the pieces of jewelry he had been holding for Sachdeva to Chakonas. S.H. provided me with invoices for these items, which include descriptions of the jewelry, but was only able to produce a photograph of one of the items, an emerald bead necklace with a diamond-set clasp Sachdeva originally purchased on November 29, 2007, for $22,383.66.

30. On February 24, 2011, I interviewed A.E., who is employed at an auction house located in Chicago, Illinois. A.E. stated that on February 21, 2011, Chakonas and a second individual, Garrett Gharibeh, met with A.E. at the auction house to discuss a possible consignment sale of jewelry.

31. The auction house had previously dealt with Chakonas, who had provided an address in Milwaukee, Wisconsin.

32. Chakonas and Gharibeh displayed to A.E. eight pieces of jewelry, which they indicated were a small representative sample of a much larger collection located in Milwaukee. A.E. indicated that Chakonas did 95 % of the talking. To the best of A.E.'s recollection, Gharibeh stated the jewelry came from Gharibeh's mother, and Chakonas added that it also came from Gharibeh's grandmother. A.E. recalls both men made representations that the jewelry came from Gharibeh's relatives. Chakonas identified himself as a friend who was helping Gharibeh sell the jewelry.

33. At the conclusion of the meeting, Gharibeh left the following three items with A.E. to be sold by the auction house:

    a. An 18 karat yellow gold, emerald, diamond, and moonstone ring, valued for insurance purposes at: $5,000;

7

b.  A two-tone gold and diamond fancy link necklace, valued for insurance purposes at: $9,300; and

c.  An 18 karat white gold, yellow sapphire and diamond necklace and earring set, valued for insurance purposes at: $25,000.

34. I provided A.E. with photographs of several of the pieces of jewelry that C.S. had been holding for Sachdeva and turned over to Chakonas. A.E. identified one of these photographs as the $5,000 moonstone ring Gharibeh and Chakonas had left at the auction house for sale.

35. I later provided S.H. with photographs of the remaining two items left at the auction house. S.H. identified both items ($9,300 necklace and $25,000 necklace and earring set) as pieces of jewelry purchased by Sachdeva that S.H. had been holding for her and turned over to Chakonas in November 2010.

36. A.E. also described the five pieces of jewelry that Chakonas and Gharibeh had displayed to A.E. on February 24, 2011, but not left for sale. A.E. later identified photographs of jewelry that had been purchased by Sachdeva from C.S. or S.H. as four of the five items displayed by Chakonas and Gharibeh.

37. On February 29, 2011, another representative of the Chicago auction house placed a telephone call to Gharibeh. With the representative's consent, this call was recorded. I have listened to a recording of the phone call. Gharibeh answered the call, but quickly stated he wanted the representative to speak to his cousin, "Tony." A person believed to be Chakonas then spoke to the auction house representative. During the call, the representative asked "Tony" where he had obtained the earrings previously shown to A.E. "Tony" stated he believed the earrings were originally made in the late 1950's, but his family purchased them in the late 1970's or early 1980's.

8

38. According to the representative of the auction house, the reference to earrings is to an item of jewelry Chakonas and Gharibeh had displayed to A.E. on February 21, 2011, which A.E. later identified as earrings purchased by Sachdeva from C.S.

39. During the call, Tony and the representative discuss meeting at the auction house later in the week and bringing additional items of jewelry for consignment sale.

40. On March 1, 2011, the representative of the Chicago auction house received an e-mail from Gharibeh (ggharibeh@gmail.com) stating that he and Tony would be "down with the earrings on Thursday [March 3, 2011]..."

41. The representative later contacted Gharibeh and rescheduled the meeting to March 4, 2011.

42. On March 4, 2011, Chakonas and Gharibeh met with the representative of the auction house in Chicago. During this meeting Chakonas and Gharibeh provided the representative with a pair of Tiffany earrings, which appear to be earrings Sachdeva purchased from C.S., and a second item, a set of earrings and necklace, which 1 believe are also items purchased by Sachdeva. Chakonas told the representative that the earrings belonged to his grandmother. Chakonas and Gharibeh left the earrings and other pieces of jewelry with the auction house representative to arrange a consignment sale.